# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| TAPESTRY, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>FACTORY MUTUAL INSURANCE COMPANY,<br>                    Defendant. | Case No.: 1:21-cv-01941-GLR |

## CERTIFICATION ORDER CERTIFYING A QUESTION OF LAW TO THE MARYLAND COURT OF APPEALS

### Question of Law to be Answered

Pursuant to the Maryland Uniform Certification of Questions of Law Act, Md. Code Ann., Cts. & Jud. Proc. §12-601, et seq., this Court respectfully requests that the Maryland Court of Appeals answer the following question of law:

> When a first-party, all-risk property insurance policy covers "all risks of physical loss or damage" to insured property from any cause unless excluded, is coverage triggered when a toxic, noxious, or hazardous substance—such as Coronavirus or COVID-19—that is physically present in the indoor air of that property damages the property or causes loss, either in whole or in part, of the functional use of the property?

The Maryland Court of Appeals, acting as the receiving court, may reformulate the question of law presented herein.

### Relevant Facts

Plaintiff, Tapestry, Inc. ("Tapestry")—the owner of modern luxury accessory and lifestyle brands, Coach, kate spade new york, and Stuart Weitzman—filed suit against Factory

1

Mutual Insurance Company ("FM") for its refusal to provide coverage (and its denial of coverage) for Tapestry's losses arising from the SARS-CoV-2 virus ("Coronavirus") and the disease that it causes, Coronavirus Disease 2019 ("COVID-19"), under the "all-risk" commercial property insurance policies FM sold to Tapestry for the policy periods April 4, 2019 to April 4, 2020 ("2019/2020 Policy") and April 4, 2020 to April 4, 2021 ("2020/2021 Policy") (each a "Policy"; collectively, the "Policies"). *See* Exhibit A, Plaintiff's First Amended Complaint ("FAC"), ¶ 1; Exhibit B, 2019/2020 Policy; Exhibit C, 2020/2021 Policy.[1]

> A.     Coronavirus and COVID-19

With the support of dozens of peer-reviewed studies, Tapestry alleges in its FAC that Coronavirus/COVID-19 are serious threats rendering objects, surfaces, and areas exposed to them dangerous and fatal. *See* Ex. A ¶¶ 26, 30, 162. Coronavirus spreads through indoor spaces via respiratory particles expelled by infected individuals (including those who are asymptomatic or pre-symptomatic). *Id*. ¶¶ 26-28, 32-33. The presence of Coronavirus in the air, through aerosols or droplets, is the virus' primary transmission vector. *Id*. ¶¶ 40-41, 43-44. Coronavirus, just like ammonia, physically transforms the content of the air and can remain airborne in respiratory particles for indefinite periods. *Id*. ¶¶ 33, 35-36, 44. Ventilation systems are particularly significant transmission vectors as studies have found Coronavirus in ceiling vent openings, vent exhaust filters, and ventilation ducts up to 180 feet from an infected individual. *Id*. ¶¶ 40, 42. As a result, Tapestry alleges that Coronavirus causes the same physical loss or damage to property as that of ammonia, smoke, soot, radon gas, asbestos and other hazardous substances. *Id*. ¶ 35.

---

[1] The facts set forth herein are drawn primarily from the FAC and the Policies. Because the case is presently at the pleadings stage, the truth of the factual allegations of the Complaint is presumed. *See E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

Coronavirus particles can also settle on surfaces that themselves become carriers for the disease ("fomites"). *Id*. ¶¶ 32, 49, 51, 53, 56. These fomites remain infectious for days after exposure and do not readily dissipate. *Id*. ¶¶ 31, 51-52, 54-55. Tapestry's various stores contain materials—like plastics, glass, metals, and fabrics—that have been documented as Coronavirus fomites. *Id*. ¶¶ 52 n.57, 59. Even disturbing a fomite—like shaking a contaminated textile such as clothing merchandise—can spread Coronavirus particles and create additional fomites. *Id*. ¶¶ 52, 59. Indeed, studies have demonstrated that "it is biologically plausible that . . . infectious disease [such as COVID-19] can be transmitted directly through contact with [Coronavirus] contaminated textiles." *Id*. ¶ 69.

Removing Coronavirus from air is not possible as a practical matter, and no amount of cleaning will prevent reintroduction of the virus when an infected person enters the space—only shutting down the property prevents the repeated and continuous reintroduction of Coronavirus. *Id*. ¶¶ 63, 76, 78. Coronavirus cannot be removed from indoor air by surface cleaning, which actually causes virus particles to become airborne. *Id*. ¶¶ 70, 74-75.

Attempting to remove Coronavirus from surfaces requires unique protocols such as the use of "harsh chemicals" that are not routinely used and which themselves are alleged to have caused additional physical loss or damage to Tapestry's stores. *Id*. ¶¶ 65-68, 71. Indeed, "Coronavirus is 'much more resilient to cleaning than other respiratory viruses so tested.'" *Id*. ¶ 64. Moreover, it is "challenging to accurately determine the efficacy of decontaminating agents and . . . if surface disinfection [is] even effective" given the toxicity of the agents and the microscopic nature of Coronavirus particles. *Id*. ¶ 66.

Nonetheless, Tapestry asserts that it repaired and remediated its physical space, such as through the removal and disposal of porous materials like clothing, reconfiguring and

3

altering interior spaces of property, and installing physical barriers to create physical distancing. *Id.* ¶¶ 71-72, 150, 155 227. Tapestry suffered massive losses, in the hundreds of millions of dollars, for extensive and costly health and safety protocols and modifications to its stores. *Id.* ¶¶ 152, 155, 227.

     B.    <u>Tapestry's Allegations of Coronavirus at its Stores and the Government Closure Orders</u>

Tapestry alleges that individuals infected with Coronavirus and COVID-19 were present on its insured properties where they spread the virus. *Id.* ¶¶ 79-80. Specifically, Tapestry claims that "at least 1,676 Tapestry employees (including 23 in Maryland) have confirmed that they contracted COVID-19, and virtually all . . . did so during periods when the Tapestry stores where they worked were open for business and they were back at work." *Id.* ¶¶ 79-80, 151. This supports the allegation that Coronavirus/COVID-19 was present at Tapestry's stores. *Id.* ¶¶ 80, 99.

Furthermore, Tapestry alleges that a detailed biostatistical analysis demonstrates that it is statistically certain that customers and other individuals who visited its stores contracted and carried Coronavirus before the stores were closed, and during the time when various stores' operations were severely restricted. *Id.* ¶¶ 83-91, 94, 96-101.

Due to the presence of Coronavirus/COVID-19 and the effects it had on Tapestry's stores (particularly the indoor air), Tapestry closed all of its North American stores beginning on March 18, 2020—prior to the issuance of government orders in many counties where Tapestry operates. *Id.* ¶¶ 56-60, 78, 119, 122, 127-128, 132, 137-38, 142.

     C.    <u>The Policies</u>

The FM Global Advantage policies FM sold to Tapestry are expensive, top-end policies with broad coverages and narrow exclusions. *See* Ex. A., ¶¶ 3, 261-65. FM drafted the Policies,

and Tapestry had no role in drafting or negotiating the Policies' terms. (*Id.* ¶¶ 2, 166, 169, 247).

The Policies insure against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." Ex. B, p.1;[2] Ex. A ¶ 170. Additionally, the Policies cover TIME ELEMENT loss (i.e., business interruption losses) "as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured." Ex. B, p.24; Ex. A ¶ 173.

The Policies' TIME ELEMENT coverages do not require complete closure or complete cessation of business. Indeed, one of the two alternative measures of TIME ELEMENT loss, GROSS EARNINGS (the other being GROSS PROFITS), provides "recovery [] to the extent that the Insured is: a) wholly or partially prevented from producing goods or continuing business operations or services." Ex. B, p.43, p.46; Ex. A ¶¶ 183, 185.

Numerous other coverages also turn on the "physical loss or damage" to Tapestry's properties, such as the Policies' ATTRACTION PROPERTY coverage (Ex. B, p. 69; Ex. A ¶¶ 221-23) and PROTECTION AND PRESERVATION OF PROPERTY and PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT coverages (Ex. B, pp. 45, 72; Ex. A ¶¶226-27).

The Policy Limit for each Policy is $1,000,000,000 per occurrence. Ex. A ¶ 171.

D.    FM's Denial of Coverage and this Litigation

As a result of its alleged losses, Tapestry provided notice to FM of its claim under the 2019/2020 Policy on or about April 2, 2020. *Id.* ¶ 300. On April 14, 2020, FM's adjuster acknowledged receipt of Tapestry's claim via letter and reserved FM's rights. *Id.* ¶ 301. Then,

---

[2] All applicable provisions of the Policies are identical. For ease of reference, only the 2019/2020 Policy (Exhibit B) will be cited herein. Referenced page numbers refer to numbers at the bottom right corner of the Policies' pages.

on June 9, 2021, Tapestry provided notice to FM of its claim under the 2020/2021 Policy. *Id*. ¶ 310.

On June 22, 2021, FM issued a letter to Tapestry denying coverage for its claim under the 2020/2021 Policy under all coverages with the sole exception of the Communicable Disease Response and Interruption by Communicable Disease coverages. *Id*. ¶¶ 250, 311. In that June 22, 2021 letter, FM claimed that the Policy's provisions, other than the Communicable Disease Response and Interruption by Communicable Disease coverages, "require physical loss or damage . . . as one of the conditions of coverage and the presence of COVID-19 does not cause physical loss or damage so that condition cannot be met." *Id*. ¶ 250, 311. FM's June 22, 2021 letter also claimed that the 2020/2021 Policy's Contamination Exclusion applied to bar coverage. *Id*.

The same day, Tapestry provided FM with Tapestry's preliminary proof of loss in the gross amount of $707,481,158. *Id*. ¶ 313. About a month later, on July 21, 2021, FM issued a second letter to Tapestry denying coverage for its claims under both Policies' under all coverages with the sole exception of the Communicable Disease Response and Interruption by Communicable Disease coverages. *Id*. ¶ 314. Just like its June 22, 2021 letter, FM's July 21, 2021 letter claimed that COVID-19 could not cause physical loss or damage to trigger various of the Policies' coverages. *Id*. None of the letters or emails FM issued to Tapestry set forth the rationale for FM's determination that "the presence of COVID-19 does not cause physical loss or damage," nor did FM provide any evidence or support for such a determination. *Id*. ¶ 325. As of the filing of the FAC, FM had not paid anything towards Tapestry's losses. *Id*. ¶ 7.

Based on these allegations, Tapestry filed its operative FAC on October 14, 2021, in which it seeks a declaratory judgment to determine the scope of the parties' rights and

obligations under the Policies. *Id*. ¶¶ 11, 327-33. Specifically, Tapestry seeks an order requiring FM to provide coverage to Tapestry under multiple coverages in the Policies. *Id*. Tapestry also seeks damages for breach of contract for FM's failure to pay its covered losses. *Id*. ¶¶ 334-38.

<u>Names and Addresses of Counsel of Record</u>

<u>For Plaintiff Tapestry</u>

Deborah B. Baum
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
(202) 663-8000
(202) 663-8007 (fax)
deborah.baum@pillsburylaw.com

Joseph D. Jean (*pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd St.
New York, New York 10019
(212) 858-1000
(212) 858-1500 (fax)
joseph.jean@pillsburylaw.com

Janine M. Stanisz (*pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd St.
New York, New York 10019
(212) 858-1000
(212) 858-1500 (fax)
janine.stanisz@pillsburylaw.com

Maria T. Galeno (*pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019
(212) 858-1000
(212) 858-1500 (fax)
maria.galeno@pillsburylaw.com

Scott D. Greenspan (*pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, New York 10019
(212) 858-1000
(212) 858-1500 (fax)
scott.greenspan@pillsburylaw.com

Laura Ann Freid-Studlo
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth St NW
Washington, DC 20036
(202) 663-8000
(202) 663-8007 (fax)
laura.freidstudlo@pillsburylaw.com

<u>For Defendant FM</u>

Bryant Steven Green
Zelle LLP
1775 Pennsylvania Avenue, NW
Suite 375
Washington, DC 20006
(202) 899-4119
(612) 336-9100 (fax)
bgreen@zelle.com

Craig David Roswell
Niles Barton and Wilmer LLP
111 S Calvert St Ste 1400
Baltimore, Maryland 21202
(410) 783-6341
(410) 783-6486
cdroswell@nilesbarton.com

<u>Designation of Appellant</u>

Pursuant to Md. Rule 8-305, Plaintiff Tapestry is designated as appellant, and Defendant FM is designated as appellee.

<u>Conclusion</u>

**IT IS ORDERED** this 25th day of April, 2022 that:

1. The following question is certified to the Maryland Court of Appeals:

    When a first-party, all-risk property insurance policy covers "all risks of physical loss or damage" to insured property from any cause unless excluded, is coverage triggered when a toxic, noxious, or hazardous substance—such as Coronavirus or COVID-19—that is physically present in the indoor air of that property damages the property or causes loss, either in whole or in part, of the functional use of the property?

2. Pursuant to Md. Code Ann., Cts & Jud. Proc. § 12-604, the Maryland Court of Appeals, acting as the receiving court, may reformulate the certified question;

3. Plaintiff Tapestry shall be treated as Appellant and Defendant FM shall be treated as Appellee;

4. The Court hereby ADMINISTRATIVELY CLOSES this case while the certified question is pending in the Maryland Court of Appeals. Within ten (10) days of the Maryland Court of Appeals' decision on the certified question, or its decision not to accept a certified question, the Parties shall file a status report with the Court that outlines a proposed schedule for further proceedings in this case.

5. The Clerk of the Court shall transmit copies of this Certification Order to counsel for the parties; and

6. Pursuant to Md. Rule 8-305(b), the Clerk of the Court shall transmit this Certification Order and seven certified copies to the Maryland Court of Appeals, together with the filing fee of $61, payable to the Clerk of the Court of Appeals. Upon receipt of a written

request and without further order of the Court, the Clerk of Court shall transmit to the

Maryland Court of Appeals certified copies of any other portions of the record of this case.

      7.     While this matter is pending before the Maryland Court of Appeals, the

parties should file status reports with this Court once every 180 days indicating the status of

the appellate proceedings.

**SO ORDERED.**

Dated: April 25, 2022                           _____/s/_____

                                         GEORGE L. RUSSELL, III,
                                         UNITED STATES DISTRICT JUDGE